J-A27033-24         2025 PA Super 107

| | | |
|---|---|---|
| IN RE: C.E.D.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: C.E.D.H., MINOR CHILD | : | |
| | : | |
| | : | No. 855 MDA 2024 |

Appeal from the Order Entered May 15, 2024
In the Court of Common Pleas of Clinton County Orphans' Court at
No(s):  2023-00004

BEFORE:  LAZARUS, P.J., KUNSELMAN, J., and McLAUGHLIN, J.

OPINION BY KUNSELMAN, J.:          **FILED: MAY 19, 2025**

C.E.D.H. (the Child) appeals the order that denied N.D.H.'s and N.A.H.'s (Adoptive Parents') petition to involuntarily terminate W.C.M.'s (Father's) parental rights to him, pursuant to the Adoption Act.  ***See*** 23 Pa.C.S.A. § 2511(a)(1), (6).[1]  After careful review, we reverse and remand for entry of an order terminating Father's parental rights.

The orphans' court made the following findings of fact, which we reproduce in relevant part:

1. Petitioners are [Adoptive Parents].  The [C]hild who is the subject of the instant Petition . . . [was] born March 2, 2023 . . . .  The biological mother of the [C]hild is [A.C. (Mother)].

2. While Mother was pregnant with the [C]hild, it was decided that, because Mother could not care for the [C]hild, the [C]hild would be adopted by a member of Mother's family.

---

[1] Although Adoptive Parents originally petitioned under Section 2511(a)(1) and (a)(6), the Child's argument on appeal relates only to (a)(1).  Thus, we need not address (a)(6).

Mother is the paternal aunt of [Adoptive Mother]. [Ultimately,] Mother signed a voluntary consent to relinquish her parental rights to the [C]hild . . . .

3. Physical custody of the [C]hild was transferred to [Adoptive Parents] on March 13, 2023, eleven (11) days after the [C]hild was born. [Adoptive Parents] have retained physical custody of the [C]hild [and the Child has resided with Adoptive Parents and Adoptive Mother's two biological children] since March 13, 2023.

4. On [March 13, 2023], the biological father of the [C]hild was unknown to [Adoptive Parents]. The biological father of the [C]hild is [Father]. Father and Mother were never married to each other.

5. Mother first advised Father that Mother was pregnant with the [C]hild in April or May of 2022, while Mother was incarcerated and Father was residing in Williamsport, Pennsylvania. Prior to this contact, Mother had been staying with Father in Father's residence and engaging in a sexual relationship with Father.

6. Father believes that, at the time the [C]hild was conceived, Mother was having sexual relations with "a lot of people," including Father. Father testified to his belief that Mother is a "liar."

7. When Father learned of Mother's pregnancy, Father believed that, due to Father's age [56 years old as of the hearing], he was not the father of the [C]hild. Father also believed that the [C]hild was not his child because Father was previously in an eleven (11) year relationship with a different woman, during which no children were conceived.

8. During Mother's pregnancy, Father took no affirmative steps to determine paternity of the [C]hild. Father did not stay in consistent contact with Mother after contacting her in April or May of 2022, because Father was not aware of Mother's whereabouts.

9. In November or December of 2022, Father attempted to locate Mother by reaching out to Mother's sister. Mother's sister spoke to Father[,] and Father asked about Mother's

whereabouts and activities. Father was advised by Mother's sister that Mother was "okay" and "safe." After this contact with Mother's sister, Father made no additional inquiries as to Mother or Mother's pregnancy.

10. On July 7, 2023, Father entered treatment for drug and alcohol abuse at a rehabilitation facility in Quakertown, Pennsylvania. During Father's time at the rehabilitation facility in Quakertown, Father was not restricted or prohibited from contacting outside individuals.

11. Sometime in July or August of 2023, while Father was in treatment, Father spoke to Mother for the first time in approximately ten (10) months. The contact . . . was initiated when Mother called Father's sister to ascertain Father's whereabouts. After speaking to Father's sister, Mother then called Father's treatment facility in Quakertown, Pennsylvania and advised Father of the planned adoption of the [C]hild by [Adoptive Parents]. During this phone call, Mother informed Father that Father might be the father of the [C]hild, and suggested that Father complete a paternity test. Following the phone call with Mother, Father discussed the [C]hild with his daughter, . . . and [his daughter] encouraged Father to complete a paternity test.

12. Some time at the end of July, 2023, Father requested that his counselor at the Quakertown treatment facility assist him in contacting the Clinton County Domestic Relations office. After contact with Domestic Relations, Father decided to pursue a paternity action. Father signed a Paternity Complaint and dated it August 4, 2023. The Paternity Complaint was filed on August 7, 2023.

13. On August 14, 2023, Father appeared at a proceeding before [the orphans' court] on the question of the [C]hild's paternity. Pursuant to an Order issued by [the orphans' court] . . . , Father was ordered to report to the office of Domestic Relations immediately following the August 14 proceedings and submit to DNA testing. Father did as ordered, and submitted to DNA testing on August 14, 2023.

14. After DNA testing, and as reflected in the DNA Test Report issued on September 7, 2023, the probability of Father's

paternity to the [C]hild was determined to be 99.9999999%. [Adoptive Parents] and Father received the results of the paternity test on September 12, 2023. On September 13, 2023, in accordance with the stipulation of the parties, [the orphans' court] entered an Order finding Father to be the biological father of the [C]hild.

15. On or about September 23, 202[3], Father left the Quakertown treatment facility and entered a halfway house in Carbondale, Pennsylvania. Father remained in the halfway house in Carbondale for one hundred (100) days.

16. [Adoptive Parents] filed a Petition for Involuntary Termination of Parental Rights of Father on October 18, 202[3].[2] [The orphans' court], pursuant to an Order dated October 23, 2023, confirmed the Consent to Adoption and Voluntary Termination of Parental Rights of Mother.

17. Father left the halfway house in Carbondale, Pennsylvania on January 1, 2024, and moved to his present address [in] Williamsport, Pennsylvania.

18. Since learning of his parentage of the [C]hild on September 12, 2023, Father has not contacted [Adoptive Parents] to ask for custody or visitation with respect to the [C]hild.

19. Father reported that he did not contact [Adoptive Parents] because Father did not believe he was allowed to make such contact, instead believing that "[he] had to do all that through the courts." Father, when asked why he believed he was not allowed to contact [Adoptive Parents] about the [C]hild, testified that Father []has ["]never been through this with any of [his] children, ever, in [his] life."

20. In addition to the [C]hild that is the subject of this action, Father has six (6) other children, all of whom are over eighteen (18) years old.

---

[2] It appears that the orphans' court made a typographical error by stating that Adoptive Parents filed the termination petition on October 18, 2024. The record reflects that their petition was filed on October 18, 2023.

21. Father was not prohibited from contacting people while he was in Quakertown and Carbondale, and Father contacted his attorney while Father was in Quakertown and/or Carbondale. Despite contacting his attorney while in Quakertown and/or Carbondale, Father did not file a custody action until February 9, 2024, after his release from the Carbondale halfway house.

22. To date, Father has not offered to provide any financial support to [Adoptive Parents] for the [C]hild.

23. Father was permitted to send cards or gifts from both the Quakertown and Carbondale facilities. Father has never sent cards or gifts to the [C]hild. Father did not send cards or gifts to the [C]hild because Father believed he was not "allowed" to make contact with the [C]hild except through the court system. Father testified that, had Father known he was permitted to send cards or gifts to the [C]hild, Father "absolutely" would have sent such items.

24. Father has never had phone or "Zoom" (video) contact with the [C]hild. Father has never had any in-person contact with the [C]hild.

25. Father filed a Complaint in Custody against [Adoptive Parents] on February 9, 2024.

26. Since custody of the [C]hild was transferred to [Adoptive Parents] on March 13, 2023, [Adoptive Parents] have provided for the [C]hild's care and support. Since March 13, 2023, [Adoptive Parents] have fed, clothed, housed, and financially supported the [C]hild. [Adoptive Parents] continue to be able to financially support the [C]hild.

27. [Adoptive Parents] report that the [C]hild "has been integrated into [the] family" since very shortly after the [C]hild's birth. [Adoptive Mother's] children . . . see the [C]hild as their brother, and hold, comfort, play with, and help feed the [C]hild.

Orphans' Court Opinion (O.C.O.), 5/15/24, at 2-8 (renumbered and reordered/combined).

The orphans' court held a termination of parental rights hearing on February 9, 2024. The court heard testimony from Adoptive Parents, Father, and Father's sister. After the hearing, the court ordered Adoptive Parents, Father, and the Child to file briefs, and the GAL to file a Memorandum of Law. *See* Orphans' Court Order, 2/12/24. On May 15, 2024, the court denied Adoptive Parents' petition to terminate Father's parental rights.

The Child timely filed this appeal.[3] He presents the following two issues for our review:

> 1. Was there an error of law by the Trial Court in declining to consider involuntary termination pursuant to 23 Pa.C.S § 2511(a)(1) because [Adoptive Parents] stated they were conceding that ground in post-hearing briefing?
>
> 2. Was there an abuse of discretion by the Trial Court by finding that Father's rights could not be terminated pursuant to 23 Pa.C.S. § 2511(a)(1) because there was less than six (6) months between confirmation of paternity through testing and filing of the Petition?

Child's Brief at 18.

The Child's first issue raises a question of standing. As our Supreme Court has explained, "[i]ssues of standing generally raise pure questions of law for which we employ *de novo* review of a trial court's decision." ***Interest of K.N.L.***, 284 A.3d 121, 132 (Pa. 2022) (citation omitted). Furthermore,

---

[3] Adoptive Parents also filed a timely appeal in this matter. However, this Court ultimately dismissed their appeal for failure to comply with Appellate Rule 3517. *See* Order, 8/23/24. This Court afforded Adoptive Parents the opportunity to file a participants' brief in this matter, which they did.

> In matters arising under the Adoption Act, . . . our plenary scope of review is 'of the broadest type;' that is, an appellate court is not bound by the trial court's inferences drawn from its findings of fact, and is compelled to perform a comprehensive review of the record for assurance the findings and credibility determinations are competently supported.

*Id.* at 132-33 (citations omitted).

A child, unless adjudicated dependent, does not have standing to file a petition to involuntarily terminate parental rights. *See In re Adoption of J.L.*, 769 A.2d 1182, 1184 (Pa. Super. 2001); 23 Pa.C.S.A. § 2512(a). Nevertheless, this Court has determined "that lack of standing to initiate the action has no bearing on the child's opportunity to participate, through counsel, in the proceeding." *J.L.*, 769 A.2d at 1184–85. It is well-settled that children have a right to counsel in a contested involuntary termination proceeding. *See* 23 Pa.C.S.A. § 2313(a). Further, "[n]o attorney or law firm shall represent both the child and the adopting parent or parents." *Id.* This Court has explained:

> The clear purpose of the mandatory appointment of counsel pursuant to § 2313(a) is to protect the interests of the child. Implicit in this appointment of counsel is a recognition that the interests of the child may be very different than or diverge from the interests of the other parties to the proceedings. Consequently, we can discern no reason why the child may not seek a remedy for perceived grievances that arise from the proceedings.

*J.L.*, 769 A.2d at 1185. Furthermore,

> If counsel disagrees with the court's decision, then, as the child's advocate, counsel has a duty to actively seek relief, including the filing [of] a post-trial motion. To deny [the child] any opportunity to seek review of the trial court's

decision, or to challenge the findings of fact and errors of law, flies in the face of why counsel is appointed in the first place.

*Id.*

In its May 15, 2024 opinion, the orphans' court explained its rationale for not terminating under Section 2511(a)(1):

> Based on this excerpt [from Adoptive Parents' post-hearing brief], it seems to this [c]ourt that [Adoptive Parents] have admitted that Father's parental rights may not legally be terminated pursuant to Section 2511(a)(1). The [c]ourt agrees with [Adoptive Parents'] assessment and for this reason, and based upon a finding that the required conduct did not continue for a period of at least six (6) months, the [c]ourt will not consider involuntary termination pursuant to this subdivision . . . .

O.C.O., 5/15/24, at 9.

In its Appellate Rule 1925(a) opinion, the court further explained:

> [Adoptive Parents], in their [post-hearing] brief, acknowledged that [F]ather's parental rights may not be legally terminated pursuant to [Section 2511(a)(1)]. Given this admission, the [c]ourt cannot consider involuntary termination under Section 2511(a)(1). Nevertheless, had the [c]ourt evaluated the merits of involuntary termination under this section, the [c]ourt would have found [F]ather's parental rights unable to be legally terminated.

O.C.O., 7/17/24, at 2 (unnumbered).

The Child argues that Adoptive Parents' forfeit of an argument in support of termination should not also forfeit the Child's ability to make that same argument. *See* Child's Brief at 24. The GAL and Adoptive Parents concur with the Child that the court erred by not considering the Child's arguments in

support of termination under Section 2511(a)(1). **See** GAL's Brief at 8; Adoptive Parents' Brief at 3.

Conversely, Father argues that the Child's appeal should be dismissed because the Child is not a "party" who would be entitled to appeal the orphans' court's decision. **See** Father's Brief at 2. Further, Father states that "[m]ore importantly, who can determine if the [C]hild is, in fact, aggrieved by the Lower Court's order" and "[w]ho knows whether the Lower Court's decision is detrimental or beneficial to this [C]hild." **Id.** at 2-3. Thus, Father asserts that "it should be determined that the [C]hild had no right to appeal the decision of the Lower Court." **Id.** at 3.

We find **J.L.** to be instructive in this matter. Although **J.L.** dealt with the denial of a child's post-trial motion after an involuntary termination proceeding, we agree with our Court's reasoning in that case, which also applies to a child filing an appeal after a termination proceeding. **See J.L.**, 769 A.2d at 1183-84. To deny the Child here an opportunity to seek review of the orphans' court's decision in a timely appeal to this Court would "fl[y] in the face of why counsel [was] appointed [to represent the Child] in the first place." **See id.** at 1185. Indeed, **J.L.** entertained an appeal raised by a child after an involuntary termination proceeding. **See id.** at 1183-84; **see also In re Z.S.W.**, 946 A.2d 726, 727-28 (Pa. Super. 2008) (addressing two appeals in a termination case, one brought by the child through her GAL).

Similarly, we reiterate that counsel is appointed to protect the interests of the child. **See J.L.**, 769 A.2d at 1185. "Implicit" in that appointment "is a

recognition that the interests of the child may be very different than or diverge from the interests of the other parties to the proceedings." *Id.*; *see also In re Adoption of L.B.M.*, 161 A.3d 172, 180 (Pa. 2017) ("the recognized purpose of the statute is to ensure that the needs and welfare of the children involved are actively advanced."). The Child and the GAL's post-hearing briefs argued that termination should be granted under Section 2511(a)(1); neither brief conceded that ground. *See* Child's Proposed Findings of Fact and Conclusions of Law, 4/5/24, at 5-6 (unnumbered) (arguing that "Father has refused or failed to perform parental duties with respect to the [Child] for the six months prior to [the] filing of this Petition"); GAL's Memorandum of Law, 4/11/24, at 4 (unnumbered) ("This [GAL] would request that the [c]ourt find that [Adoptive Parents] are successful under 23 Pa.C.S.A. § 2511(a)(1)"). Because the Child had an independent, protected interest in the termination proceeding, the Child's arguments (through his counsel and the GAL) in support of termination should have been considered by the orphans' court in rendering its decision. Put another way, Adoptive Parents' concession was not binding on the Child, who had separate representation and an independent interest in the proceeding. *See J.L.*, 769 A.2d at 1185. Thus, the orphans' court erred by not considering termination under Section 2511(a)(1) based on Adoptive Parents' concession.

Further, our case law recognizes that children have two kinds of interests in termination of parental rights cases: best and legal interests. *See L.B.M.*, 161 A.3d at 174 ("In cases involving children, the law acknowledges

- 10 -

two separate and distinct categories of interest: a child's legal interests . . . and a child's best interests . . . .") (footnotes omitted). Children are specifically appointed counsel to represent their legal interests, and "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020) (citation omitted). Here, the Child was represented by counsel and a GAL who each advocated for his interests. Therefore, Father's arguments, that no one can determine if the orphans' court's order is detrimental or beneficial to the Child or if the Child is aggrieved by the order, are unavailing. The Child's first issue merits relief.

In his second issue, the Child argues that the court abused its discretion by finding that Father's parental rights could not be terminated under Section 2511(a)(1) because less than six months had passed between confirmation of Father's paternity and Adoptive Parents filing the termination petition. **See** Child's Brief at 24-25.

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that

often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

To the extent that the Child's claims also require us to engage in statutory interpretation, the interpretation of a statute is a question of law. *See In re Adoption of B.G.S.*, 245 A.3d 700, 704-05 (Pa. Super. 2021) (citing *G.A.P. v. J.M.W.*, 194 A.3d 614, 616 (Pa. Super. 2018)). For questions of law, our standard of review is *de novo* and our scope of review is plenary. *Id.*

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child . . . .

*In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019) (citation omitted); *see also Interest of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re*

*C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of*

*Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Section 2511(a)(1) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

Here, the termination petition was filed in October 2023; thus, the statutory timeframe to examine Father's actions began in April 2023. Our Supreme Court has "reinforce[d] the view that the six-month period immediately preceding the filing of the petition is the **most** critical period to evaluate for affirmative conduct or its absence . . . ." *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021) (citation omitted) (emphasis in original). "The trial court must examine the individual circumstances of each case and consider all of the explanations of the parent to decide if the evidence, under the totality of the circumstances, requires involuntary termination." *In re I.J.*, 972 A.2d 5, 10 (Pa. Super. 2009) (citing *In re B.,N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005)).

Regarding parental duties, we have explained that:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of

a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, . . . the parental obligation is a positive duty which requires affirmative performance.

***B.,N.M.***, 856 A.2d at 855 (citation omitted).

Furthermore,

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

***Id.*** (internal citations omitted).

Once a settled purpose of relinquishing parental rights or a failure to perform parental duties is established, "the court must engage in three lines of inquiry: (1) the parent's explanation for [the parent's] conduct; (2) the post-abandonment contact between [the] parent and [the] child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b)." ***Z.S.W.***, 946 A.2d at 730 (citation omitted).

Here, the orphans' court explained its reasoning as follows:

In this case, the Petition for Involuntary Termination of Parental Rights was filed on October 18, 2023. Father, however, did not have definite confirmation that he was the [C]hild's father until [F]ather received the results of a paternity test on September 13, 2023. Based on these dates, it is clear to [the orphans' court] that [F]ather could not have "evinced a settled purpose of relinquishing

- 14 -

parental claim to a child" or "refused or failed to perform parental duties" for a period of at least six (6) months prior to the filing of the petition. For this reason, had the [orphans' court] considered [Adoptive Parents'] Petition for Termination pursuant to Section 2511(a)(1), or the arguments presented by [c]ourt[-]appointed counsel for the [C]hild and [GAL], the [orphans' court] would still have found in favor of [] [F]ather.

O.C.O., 7/17/24, at 2-3 (unnumbered).

On appeal, the Child, the GAL, and Adoptive Parents argue that the orphans' court erred by applying the wrong standard under Section 2511(a)(1). They assert that the six-month period under that subsection does not commence when a potential father's paternity is confirmed through a paternity test. *See* Child's Brief at 25; GAL's Brief at 10; Adoptive Parents' Brief at 4. Instead, the six-month period begins when a potential father knows or should know about the child's existence and the possibility that he is the child's father. *See* Child's Brief at 25; GAL's Brief at 13; Adoptive Parents' Brief at 5. They argue that Father knew about the Child and the possibility that he was the Child's father more than six months before the termination petition was filed. *See* Child's Brief at 25-26; GAL's Brief at 13-14; Adoptive Parents' Brief at 5. Thus, according to them, even though Father did not receive the paternity results until September 2023, one month before the termination petition was filed, his parental rights could still be terminated based on his actions in the six months before the petition was filed.

Conversely, Father argues that "[c]learly, [he] was not aware and did not even suspect that he was the [f]ather of the [C]hild until the DNA test,

initiated by [him], revealed that he was the [C]hild's [f]ather." **See** Father's Brief at 5. Because the paternity test results were received one month before the termination petition was filed, Father argues that he could not have exhibited the requisite conduct under Section 2511(a)(1) for a period of six months immediately preceding the filing of the termination petition. **See id.** at 5-6. Father admits that "it cannot be denied that [Father] failed in the . . . 6-month period[] prior to the filing of the termination [p]etition," but states that the orphans' court looked to the reasons for Father's failure and did not mechanically apply the statute. **See id.** at 6.

For termination under Section 2511(a)(1), this Court has previously clarified that "[t]he most critical question . . . is when [f]ather knew or should have known of [c]hild's existence, and the possibility that he was [c]hild's father." **B.G.S.**, 245 A.3d at 707. We have explained:

> While the plain language of Section 2511(a)(1) does not require that a parent know, or have reason to know, of a child's existence before the relevant six-month period begins, our case law instructs that a court must consider the performance of a parent "'in light of what would be expected of an individual in circumstances in which the parent under examination finds himself.'" Our case law also provides that a parent need not "perform the impossible" in order to maintain contact with a child. A court must consider the obstacles limiting a parent's ability to perform his or her parental duties, and a parent's failure to perform those duties may be excusable if he or she acted reasonably and in good faith. Certainly, it would be contrary to these principles to hold a father responsible for failing to perform his parental duties during a time when he did not know, and had no reason to know, that he was a parent.[FN 2]

- 16 -

FN 2 If a father knows or has reason to know of a child's existence, he need not have conclusive proof of his paternity before the relevant six-month period begins. *See Z.S.W.*, 946 A.2d at 731 ("We decline to accept the trial court's rational[e] that [the father] was only required to 'attempt the level of parenting consistent with his and the agency's knowledge of parentage.'").

*Id.* (internal citations omitted). In *Z.S.W.*, this Court explained the "crux of the trial court's statement is that [father] was not required to perform any parental duties until he received the results of the paternity test. To adopt the trial court's rationale would relieve all fathers of their parental duties until their parentage was confirmed by a paternity test." *Z.S.W.*, 946 A.2d at 731. Thus, this Court declined to accept the trial court's rationale. *See id.*

Here, as noted above, Father received the results of the paternity test confirming he was the Child's biological father on September 12, 2023, and Adoptive Parents filed their termination petition on October 18, 2023. However, Father testified that he became aware of the Child's existence while Mother was pregnant. *See* N.T., 2/9/24, at 22, 29. The orphans' court made a finding of fact, corroborated by Father's testimony, that "Mother first advised Father that Mother was pregnant with the [C]hild in April or May of 2022 . . . ." O.C.O., 5/15/24, at 3; *see also* N.T. at 34, 40. Father testified that, at the time, she did not inform him that he could be the Child's father because she did not know. *See* N.T. at 37-38. However, "[p]rior to this contact, Mother had been staying with Father in Father's residence and engaging in a sexual relationship with Father." O.C.O., 5/15/24, at 3; *see also* N.T. at 40.

- 17 -

Father did not have contact with Mother again until July 2023. *See* N.T. at 35-37. At the hearing, Father was asked about having no contact with Mother although he knew she was pregnant at one point, and that there was the possibility that he was the Father. *See id.* at 37. Father responded "[r]ight." *See id.* Additionally, Father was asked if it occurred to him "in any way, shape, or form" when he found out that Mother was pregnant that the Child could be his. *See id.* at 40. Father said, "[c]ould have, could have not. I figured more than likely not because of my age." *See id.* When asked, "[b]ut you at least knew there was a potential that that was your kid[,]" Father responded, "[r]ight." *See id.* The court also found that "[d]uring Mother's pregnancy, Father took no affirmative steps to determine paternity of the [C]hild." O.C.O., 5/15/24, at 3; *see also* N.T. at 41.

We question the accuracy of Father's testimony regarding the dates because the Child was not born until March 2, 2023. Thus, it appears that Mother could not have been pregnant yet in April or May 2022, when he claims she first called him, based on an ordinary pregnancy timeline. Nevertheless, Father clearly testified multiple times that he was aware of Mother's pregnancy before the Child was born. Therefore, at the very latest, Father knew about the Child before March 2, 2023. Father also indicated that he was aware that he could be the Child's father.

We reiterate that, under Section 2511(a)(1), "[i]f a father knows or has reason to know of a child's existence, he need not have conclusive proof of his

paternity before the relevant six-month period begins." *See B.G.S.*, 245 A.3d at 707 n.2 (citing *Z.S.W.*, 946 A.2d at 731). Because Father knew of the Child's existence, and the possibility that he was the Child's father, before March 2, 2023 (and likely as early as mid-2022), the relevant six-month period under Section 2511(a)(1) began to run before Father received the paternity results in September 2023. *See id.* at 707. Thus, the orphans' court erred by misapplying Section 2511(a)(1). The court should have examined Father's actions in the six months before the petition was filed (April to October 2023) to decide if termination was warranted.

Turning to the relevant six-month period, the orphans' court made findings of fact, which are corroborated by Father's testimony, that Father never offered any financial support for the Child; never sent cards or gifts to the Child; and never had phone, Zoom/video, or in-person contact with the Child. *See* O.C.O., 5/15/24, at 7; N.T. at 28, 50-51. Father testified that he had done nothing to try to see the Child and had never met him. *See* N.T. at 22, 50. However, Father was not prohibited from contacting outside individuals while at the rehabilitation facility or halfway house; he contacted his attorney during that time. *See* O.C.O., 5/15/24, at 7; N.T. at 48.

In July or August 2023, Father spoke to Mother for the first time in approximately ten months, when Mother called him. *See* O.C.O., 5/15/24, at 4. "During this phone call, Mother informed Father that Father might be the father of the [C]hild, and suggested that Father complete a paternity test."

*Id.* Mother also advised Father of the planned adoption. *Id.* Afterwards, "Father discussed the [C]hild with his daughter . . . and [his daughter] encouraged Father to complete a paternity test." *Id.* at 5. Father then filed a paternity complaint in August 2023. *Id.* However, even after Father received the paternity test results in September 2023, he did not contact Adoptive Parents to ask for custody or visitation. *See id.* at 6. He did not file a custody action against Adoptive Parents until the morning of the termination hearing on February 9, 2024, four months after the termination petition was filed. *See id.* at 7; 23 Pa.C.S.A. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). Thus, the record reflects that during the six-month period at issue, the **only** action Father took regarding the Child was to file a paternity complaint. Father did this after he found out about the planned adoption, and Mother and his daughter encouraged him to take a paternity test. The record supports that Father either evidenced a settled purpose of relinquishing his parental claim or refused or failed to perform parental duties during the six-month period. *See* 23 Pa.C.S.A. § 2511(a)(1).

As explained above, once a settled purpose of relinquishing parental rights or a failure to perform parental duties is established, "the court must engage in three lines of inquiry." *Z.S.W.*, 946 A.2d at 730 (citation omitted).

For the first inquiry regarding Father's explanation for his conduct, Father testified to various reasons why he made no effort regarding the Child during the six-month period. The court's findings of fact, which repeated Father's testimony, included, among other things, that Father believed that he was not the Child's father, that he was not allowed to contact Adoptive Parents or the Child, and that he had to do everything through the courts. *See* O.C.O., 5/15/24, at 3, 6-7.

However, the uncontradicted evidence of record does not support Father's explanations. Father admitted that he knew of the Child's existence and the possibility that he was the Child's father. Before Father learned of Mother's pregnancy, she had been staying at his residence, and the two had a sexual relationship. Thus, Father's beliefs, that he was not the Child's father and that Mother was having sexual relations with other people, do not excuse his unreasonable, complete lack of action during the six-month period. *See* ***B.G.S.***, 245 A.3d at 707 (noting "a parent's failure to perform [parental] duties **may** be excusable if he or she acted reasonably and in good faith." (emphasis added)). As explained above, Father could not wait for a positive paternity test to begin performing parental duties. *See Z.S.W., supra.*; *B.G.S., supra*.

Further, again, the only action Father took during the six-month period was to file a paternity complaint. He did not file for custody until the morning of the termination hearing, **five months** after he received the results of the

paternity test. Father also never contacted Adoptive Parents about the Child, even though he admitted that he received the termination petition which contained Adoptive Parents' address. *See* N.T. at 26, 39. Even if Father truly believed that he could not contact Adoptive Parents and the Child and had to do everything through the courts, he failed to take meaningful action through the courts before the termination petition was filed.[4] This is true even though Father testified that he had an attorney who he spoke to while in the rehabilitation facility and/or the halfway house. Therefore, Father did not "exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *B.,N.M.*, 856 A.2d at 855 (citation omitted).

For the second line of inquiry related to post-abandonment contact between Father and the Child, Father admitted that he had done nothing to try to see the Child and had never met him. *See* N.T. at 22, 50.

_____

[4] Our Supreme Court has explained that "a parent's legal efforts to enforce custodial rights demonstrate affirmative performance of a positive parental duty." *In re Adoption of C.M.*, 255 A.3d 343, 367 (Pa. 2021); *see also In re Adoption of L.A.K.*, 265 A.3d 580, 595 (Pa. 2021) ("Based upon our ruling in *C.M.*, Father must be credited for his assertion of custody rights during the crucial six-month period."). However, in *C.M.* and *L.A.K.*, the father asserted his custody rights **during** the relevant six-month period. Here, critically, Father did not assert his custody rights until the morning of the termination hearing, four months after the termination petition was filed and more than six months after he learned of the pregnancy and the Child's birth. *See In re E.S.M.*, 622 A.2d 388, 395 (Pa. Super. 1993) ("[A] father cannot protect his parental rights by merely stating that he does not wish to have his parental rights terminated."). Thus, *C.M.* and *L.A.K.* are readily distinguishable from this case.

For the third line of inquiry related to consideration of the effect of termination on the Child pursuant to Section 2511(b), that subsection provides:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511(b).

Here, again, the Child has never met, interacted with, or even received a card from Father. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." **In re Adoption of C.P.D.**, 324 A.3d 11, 27 (Pa. Super. 2024) (citation omitted). Thus, we need not remand for the orphans' court to do a Section 2511(b) analysis. Further, Adoptive Parents testified that they believed it was in the Child's best interests to terminate Father's parental rights. **See** N.T. at 9, 16. The Child has been "integrated into [their] family since very shortly after his birth[,]" and they have treated him "as though he was one of the other children in [their] household." **See id.** at 11, 18. Adoptive Parents stated that Adoptive Mother's biological children view Child has their brother. **See id.** at 11, 18-19. The orphans' court also commended Adoptive Parents for their actions with respect to the Child. **See** O.C.O., 5/15/24, at 13. The court

noted that it found Adoptive Parents "to be loving, caring, conscientious, and responsible in raising the Child." *Id.*

We reiterate that "the parental obligation is a positive duty which requires affirmative performance." ***B.,N.M.***, 856 A.2d at 855 (citation omitted). Furthermore, "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs." ***Id.*** (citation omitted). Additionally, "a child's life 'simply cannot be put on hold in the hope that [the parent] will summon the ability to handle the responsibilities of parenting.'" ***Z.S.W.***, 946 A.2d at 732 (citation omitted). Given Father's complete lack of action during the relevant six-month period, which has resulted in the lack of evidence of any bond between Father and the Child, the record supports termination of Father's parental rights. The Child's second issue merits relief.

In sum, we conclude that the orphans' court erred: 1) by denying termination under Section 2511(a)(1) because Adoptive Parents' had conceded that argument, even though the Child preserved that argument, and 2) by finding that, even absent Adoptive Parents' concession, it would have denied termination under (a)(1) based on when Father received the paternity test results. Our review of the record indicates that there was clear and convincing evidence to support termination under Section 2511(a)(1) and (b).

Accordingly, we reverse the orphans' court, and remand for entry of an order terminating Father's parental rights.

Order vacated. Case remanded for entry of an order terminating Father's parental rights. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/19/2025