J-S40004-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.L., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.C. | : : : : : : | |
| | : | No. 1017 MDA 2025 |

Appeal from the Decree Entered July 1, 2025
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s):  A-9573

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:                **FILED: JANUARY 16, 2026**

T.C. (Father)[1] appeals from the decree, entered in the Court of Common Pleas of Luzerne County, Orphans' Court Division, involuntarily terminating his parental rights to A.M.L. (Child).  After review, we affirm on the basis of the well-written opinion authored by the Honorable Jennifer L. Rogers.

Because we rely on the trial court's opinion, including its recitation of the relevant facts, we provide only a summary here.  A.M.L. was born in October of 2022.  At the hospital after Child was born, Child's mother, P.L. (Mother), identified only D.J. as Child's father.  *See* N.T. Termination Hearing, 2/3/25, at 10-11, 23.  Child was placed into foster care upon discharge from the hospital.

_____

[1] While we refer to T.C. as "Father" for clarity's sake, as discussed below, T.C.'s relationship to Child was contested and uncertain throughout the proceedings.

On January 19, 2024 Luzerne County Children, Youth, and Families (the Agency) filed a petition for the involuntary termination of Mother's parental rights and a petition to confirm consent to adoption as to D.J.[2] On April 10, 2024, the trial court entered decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b) and D.J.'s parental rights pursuant his consent to the adoption of Child.

In May of 2024, Father contacted the Agency claiming to be Child's biological father. *See id.* at 11. Father informed Jamie Stuart, the Agency's caseworker assigned to Child, that "he was depending on the natural mother to get her life together[,] and that she was going to then care for the child." *Id.* at 11-12. Father claimed to have been at the hospital when Child was born and that the Agency was otherwise aware of him, but Stuart testified that she found no reference to T.C. as a potential father to Child in Child's case file. *Id.* at 44. T.C. did not appear for a court-ordered DNA test and instead signed an Acknowledgment of Paternity in September of 2024. *Id.* at 46-47.

The Agency filed a petition to terminate Father's parental rights on July 29, 2024. After hearings on February 3 and March 24, 2025, the trial court entered a decree terminating Father's parental rights pursuant 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

---

[2] D.J., while treated as the putative father, never took part in genetic testing or signed an Acknowledgment of Paternity. *See id.* at 23.

Father filed a timely *pro se* notice of appeal, and his appointed counsel subsequently filed a Pa.R.A.P. 1925(b) statement.[3] The trial court also issued a Rule 1925(a) opinion. Father raises the following issues for our review:

1. Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to [section] 2511(a) of the Adoption Act?

2. Whether the trial court erred in terminating parental rights and/or abused its discretion with respect to [section] 2511(b) of the Adoption Act?

Father's Brief, at 3.

Our standard of review here is well-settled:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

---

[3] Father initially filed a *pro se* notice of appeal on July 29, 2025, wherein he incorrectly represented that he did not have legal representation at the time. On August 6, 2025, Joseph C. Borland, Esquire, Father's then-counsel, filed a petition to withdraw as counsel with the trial court. The trial court granted the petition the same day and appointed Paul Ware, Esquire, as Father's counsel. This court filed an order on August 7, 2025 requiring Attorney Ware to file a Rule 1925(b) statement to comply with Pa.R.A.P. 1925(a)(2). *See id.* (providing requirements for filing children's fast track appeal); *see also In re K.T.E.L.*, 983 A.2d 745 (Pa. Super. 2009) (failure to file contemporaneous concise statement with notice of appeal results in defective notice of appeal but is only procedural violation which does not require quashal).

*In re L.W.*, 267 A.3d 517, 522 n.4 (Pa. Super. 2021) (citation omitted).

> Subsections 2511(a) and (b) of the Adoption Act set forth the grounds a petitioner must prove in order for the court to grant an involuntary termination of parental rights. *See* 23 Pa.C.S.[A.] § 2511. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.] . . . If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in [s]ubsection 2511(a), the court must then consider whether termination would best serve "the developmental, physical[,] and emotional needs and welfare of the child" under [s]ubsection 2511(b).

*In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021) (citations omitted).

Here, the trial court terminated Father's rights pursuant to subsection 2511(a)(1), which provides that the rights of a parent may be terminated when: "The parent[,] by conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S.A. § 2511(a)(1). In other words, subsection 2511(a)(1) permits termination "upon establishing parental abandonment." *In re Adoption of B.A.S.*, 345 A.3d 787, 793 (Pa. Super. 2025) (quoting *In re Adoption of L.A.K.*, 265 A.3d 580, 583 (Pa. 2021)).

> A "wealth of Superior Court jurisprudence instructs trial courts deciding [s]ubsection 2511(a)(1) cases to consider the whole history of a given case and 'not mechanically apply the six-month statutory provision[,]' although 'it is the six months immediately preceding the filing of the petition that [are] most critical to the analysis.'" *In re Adoption of C.M.*, 255 A.3d at 364 (citations omitted).

> When considering a request to terminate rights under [subs]ection 2511(a)(1), a parent's failure or refusal to perform parental duties

- 4 -

must be analyzed in relation to the particular circumstances of the case. *In re Adoption of L.A.K.*, 265 A.3d at 592. A parent's efforts "are always considered 'in light of existing circumstances.'" *Id.* (citations omitted). The "focus of the inquiry is whether, under the circumstances, the parent has acted with reasonable firmness in refusing to yield to the obstacles that have prevented the performance of parental duties." *Id.* at 592–93 (citations omitted). The Supreme Court explained:

[E]ven where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by [subs]ection 2511(a)(1), the court "must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination [of parental rights]." Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to [subs]ection 2511(b). We reiterate that the purpose of this analysis is to give effect to our mandate that courts avoid a mechanical application of the law regarding the termination of parental rights. The law must be applied with the purpose of serving [the] needs and welfare of each individual child in his or her particular circumstances. It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a [subs]ection 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship.

> In all instances, the trial court considered the explanation offered by the parent when deciding whether termination of parental rights was warranted.
>
> *Id.* at 593 (citations omitted).

*In re Adoption of B.A.S.*, 345 A.3d at 794.

Father argues that the court erred in finding that the Agency met its burden under subsection 2511(a)(1) because: he provided certain essentials, such as a crib, blankets, and a car seat to Mother after Child was born; the Agency never notified Father of Child's dependency proceedings; the Agency acknowledged that it was unaware of Father until after it had filed a petition to terminate Mother's parental rights; and the Agency did not inquire regarding Father's ability to care for Child. *See* Father's Brief, at 13-14.

We agree with the trial court that there was sufficient evidence presented at the termination hearing to establish grounds for termination under subsection 2511(a)(1). In its opinion, after laying out a lengthy recitation of the testimony elicited at trial, *see* Trial Court Opinion, 9/9/25, at 6-14, the trial court examined Father's explanation for his conduct, *see id.* at 15-17, the lack of post-abandonment contact between Father and the Child, *see id.* at 18, and the evidence in support of termination under subsection 2511(b). *See id.* at 18-20.[4] Based upon our review of the record, we find

---

[4] While Father provided testimony contradictory to the evidence relied upon by the trial court, the trial court did not find Father credible. *Id.* at 9 (finding Father's testimony "inconsistent, unreliable[,] and not credible"); *see also In the Interest of K.T.*, 296 A.3d 1085, 1117 (Pa. 2023) ("Appellate courts reviewing such fact-bound claims arising in termination matters 'should defer
*(Footnote Continued Next Page)*

the trial court's analysis to be supported by competent evidence and agree with its determination under subsection 2511(a)(1). *See* N.T. Termination Hearing, 2/3/25, at 104 (Father explaining why he waited until May of 2024 to reach out to the Agency); *id.*, 3/24/25, at 60 (Stuart testifying that Child would not suffer negative or detrimental effects if Father's rights were terminated and that adoption is in Child's best interest).

Because we have found evidence to support termination under subsection 2511(a)(1), we turn now to the trial court's 2511(b) analysis. "To determine whether the petitioning party has met [its] burden [under subsection 2511(b)], the court must conduct a[n] analysis focused on the child." *In the Int. of K.T.*, 296 A.3d at 1114. The trial court must "consider whether termination would best serve 'the developmental, physical[,] and emotional needs and welfare of the child[.]'" *In re Adoption of C.M.*, 255 A.3d at 359. "[T]he child's 'emotional needs' and 'welfare' include 'intangibles such as love, comfort, security, and stability.'" *In the Int. of K.T.*, 296 A.3d at 1106 (citation omitted). "The court must not truncate its analysis and preclude severance based solely on evidence of an 'adverse' or 'detrimental' impact to the child." *Id.* at 1114. "Therefore, to grant termination when a

---

to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan[.] . . . [W]e are not in a position to reweigh the evidence and the credibility determinations of the trial court.'").

parental bond exists, there must be clear and convincing evidence that the bond is not necessary and beneficial." *Id.*

Father argues that the trial court erred in finding that termination was proper under subsection 2511(b) because Father had a strong desire to bond with Child, and the Agency did not allow for that bond to form. We disagree with Father and find ample support in the record for the trial court's subsection 2511(b) determination. The trial court thoroughly considered Child's bond with her foster parents, their ability to care for and support Child, their ability to meet her physical, developmental, and emotional needs, and their willingness to adopt Child. *See* Trial Court Opinion, 9/9/25, at 18-19 (citing N.T. Termination Hearing, 3/24/25, at 55-57, 61, 68). The trial court also considered the lack of a necessary and beneficial bond between Child and Father and the positive impact the termination of Father's rights would have on Child. *See* Trial Court Opinion, 9/9/25 at 19-20 (citing N.T. Termination Hearing, 3/24/25, at 57-60). Again, we find the trial court's analysis here to be supported by the record.

Mindful of the record, the applicable standard of review, the relevant caselaw, and the parties' briefs, we affirm on the basis of the trial court's thorough and well-reasoned opinion. *See id.* at 1-23. The parties are directed to attach a copy of Judge Rogers' opinion in the event of further proceedings.

Decree affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/16/2026

Received 10/12/2025 12:34:29 PM Superior Court Middle District

Filed 10/12/2025 12:34:00 PM Superior Court Middle District
1017 MDA

| IN THE INTEREST OF | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| A.M.L., | : | |
| | : | ORPHAN'S COURT DIVISION |
| a Minor | : | |
| | : | Adoption No. A-9573 |
| | : | 1017 MDA 2025 |

RECORDED
09/09/2025 10:24:08 AM
JUDICIAL SERVICES & RECORDS
LUZERNE COUNTY
PENNSYLVANIA
Inst Num:        202547858

## OPINION ISSUED PURSUANT TO PA. R.A.P. 1925 (a)

## I.   PROCEDURAL HISTORY

On January 19, 2024, Petitioner, Luzerne County Children, Youth and Families (Children and Youth), filed a Petition for the Involuntary Termination of Parental Rights (Petition) of the natural mother (Mother) and a Petition to Confirm Consent to Adoption of the putative father, D.J. as to the minor child, A.M.L. On April 10, 2024, the Court entered decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §2511 (a)(1) and the putative father, D.J.'s, parental rights pursuant to his consent to the adoption of the minor child, A.M.L. Neither Mother nor the putative father, D.J., filed an appeal to the Court's decrees. Mother only named the putative father, D.J. as the father of A.M.L.

In a complex turn of events, explained in detail further in this Opinion, putative father, Appellant, T.C., (Father) contacted Children and Youth in May of 2024 claiming to be the child's father. He later signed an acknowledgement of paternity in September of 2024, five (5) months subsequent to Mother's parental rights being terminated. Children and Youth filed a petition to terminate Father's parental rights on July 29, 2024. Hearings were held on February 3, 2025, and on March 24, 2025. During the hearings, Father was represented by his private counsel. On June 30, 2025, the court entered a decree terminating Father's parental rights to the child, A.M.L. pursuant to 23

Pa.C.S.A. §2511 (a)(1). Children and Youth also requested a change of primary goal to adoption in the companion dependency matter before the Court.

In entering this decree, the Court gave primary consideration to the developmental, physical, and emotional needs and welfare of the child pursuant to 23 Pa.C.S.A. § 2511(b).

On July 29, 2025, Father, *pro se*, filed a Notice of Appeal to the Court without a Concise Statement of Matters on Appeal. On August 6, 2025, this court entered an Order granting private counsel's Petition for Leave of Court to Withdraw as Counsel and entered an additional court order appointing counsel for Father. On August 7, 2025, the Superior Court ordered court appointed counsel to file the Statement of Errors Complained of on Appeal no later than August 18, 2025. On August 18, 2025, court appointed counsel filed a Notice of Appeal and a Statement of Errors Complained of on Appeal. Father's Statement of Matters Complained of on Appeal is as follows:

1.      The Trial Court erred in terminating parental rights pursuant to the requirements of the Adoption Act of 1980, October 15, P.L. 934, No. 163 §1, et. Seq.

2.      Specifically, the Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidentiary evidence support for the Court's decision that grounds for termination of parental rights were met with respect to Title 23 Pa. Section 2511 (a) of the Adoption Act.

3.      Specifically, the Trial Court abused its discretion, committed an error of law, and/or that there was insufficient evidentiary evidence support for the Court's decision that the best interest of the minor child would be served by terminating Appellant's parental rights with respect to Title 23 Pa. Section 2511 (b) of the Adoption Act.

2

4. Counsel for Appellant reserves the right to amend this document within a reasonable time after receipt of transcript.

## II. FINDINGS OF FACT

The minor child, A.M.L., was born on October 2022. A.M.L. is currently two (2) years and eleven (11) months old. This appeal involves the proposed termination of Father's parental rights. It is unrebutted that the date of placement was November 1, 2022. At the time Father first contacted Children and Youth in May of 2024, regarding A.M.L., Mother's parental rights and putative father, D.J.'s parental rights had been terminated. N.T. 3/24/25 at 14. Although Father claimed that he contacted Children and Youth prior to May 2024, Jamie Stewart, a caseworker for Children and Youth never spoke to Father prior to that date nor found any record of any one else speaking to Father regarding A.M.L. prior May 2024.

The record supports the finding that at least six (6) months prior to the filing of the petition to terminate Father's parental rights, Father did not perform any significant parental duties regarding the minor child. N.T. 2/3/25 at 13-14. Father also did not engage in any services toward reunification with the minor child throughout the case. *Id.* at 37.

In meeting its requisite burden of proof by clear and convincing evidence regarding the termination of Father's parental rights, Petitioner offered the testimony of Jamie Stewart, caseworker at Luzerne County Children and Youth. Father testified on his own behalf.

## III. CONCLUSIONS OF LAW

3

After consideration of the credible evidence as summarized above and more detailed below, the Court concludes:

(1) Children and Youth has shown by clear and convincing evidence that the parental rights of the Father to the minor child, A.M.L., should be terminated pursuant to 23 Pa.C.S.A. Section 2511(a)(1).

(2) Children and Youth has shown by clear and convincing evidence that the termination of the parental rights of Father, best serves the needs and welfare of the child, A.M.L., pursuant to 23 Pa. C.S.A. Section 2511(b).

## IV. DISCUSSION: GROUNDS FOR TERMINATION OF FATHER'S PARENTAL RIGHTS

There was sufficient evidence presented at trial to establish grounds for termination under 23 Pa.C.S.A.§2511 (a)(1). The statute permitting involuntary termination of parental rights in Pennsylvania, 23 Pa. C.S.A. Section 2511, sets forth the certain irreducible minimum requirements of care that parents must provide to their children. A parent who cannot or will not meet the requirements within a reasonable time following the intervention by the State may properly be considered unfit and may properly have his or her rights terminated. *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa. Super. 2002).

Termination of parental rights is an issue of constitutional dimensions because of the fundamental right of an individual to raise his or her own child. Therefore, in proceedings terminating parental rights, the Petitioner must prove by clear and convincing evidence that the statutory criteria have been met. *Santosky v. Kramer*, 455 U.S. 745 (1982), *In Re: T.R.*, 502 Pa. 165, 465 A.2d 642 (1983). However, as the

4

Pennsylvania Supreme Court has stated "a parent's basic constitutional right to custody and rearing of his or her child is converted upon the failure to fulfill his or her parental duties to the child's right to have proper parenting in fulfillment of his or her potential in a permanent, healthy, safe environment." *In Re: J.A.S., Jr.*, 2003 Pa. Super. 112, (*citing In the interest of Lillie*, 719 A.2d 327 (Pa. Super 1998))

A court may terminate parental rights under Section 2511(a)(1) when:

The parent by conduct continuing for a period of at least six months immediately preceding the filing of the Petition has either evidenced a settled purpose of relinquishing parental claim to a child **OR** has refused or failed to perform parental duties. (emphasis added)

Parental duties are multifaceted. The Pennsylvania Superior Court has addressed the issue in *In re Shives*, 363 Pa. Super. 225, 525 A.2d. 801, 802 (1987) in *citing In re Burns*, 474 Pa. 615, 379 A.2d 535 (1977):

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child . . . These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child . . . the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

A parent must demonstrate a continuing interest in the child and make a genuine effort to maintain communication and association with the child. *In re Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975). Appellate courts have set forth a very strict standard for measuring a parent's performance of parental duties. A parent must exert himself to take and maintain a place of importance in a child's life and a continuing duty

to love, protect and support his child and to maintain communication and association with the child even after separation. He must pursue a course of conduct consistently aimed at maintaining the parental relationship. *In re Adoption of M.J.H.*, 501 A.2d 648 (Pa. Super. 1985); *In re V.E.* 611 A. 2d 1267 (Pa. Super. 1992); and *Adoption of S.H.*, 383 A.2d. 529 (Pa. 1978).

Ms. Jamie Stewart testified that she is employed by Luzerne County Children, Youth and Families as a permanency caseworker. In that capacity, she is responsible for assessing the safety and well-being of children, making appropriate referrals, and coordinating appointments and services. Ms. Stewart stated that she has been employed with the agency for approximately twenty-five (25) years as an ongoing caseworker. N.T. 2/3/25 at 9–10, 44. Ms. Stewart explained that she became the assigned caseworker in the present matter in January 2023. *Id.* at 43. When a case is transferred from intake, her first step is to review the file. In this case, after reviewing the file, she found no reference to T.C. as a potential father of the child. *Id.* at 44.

Ms. Stewart testified that the child, A.M.L., was born on October   , 2022. She related that a putative father, identified as D.J., executed a consent to adoption. Another putative father, T.C., did not come forward until much later, ultimately signing an acknowledgment of paternity in the Fall of 2024. *Id.* The minor child, A.M.L., was placed in foster care on November 1, 2022, immediately upon discharge from the hospital. At the time of placement, a caseworker from Children and Youth was in contact with the Mother, who identified D.J. as the child's father. Mother did not identify any other possible fathers. *Id.* at 10, 20. Ms. Stewart recalled meeting Mother in person sometime in 2023. During that meeting, Mother never indicated that T.C. could be A.M.L. 's biological father. Although D.J., the putative father, never submitted to

6

genetic testing nor signed an Acknowledgment of Paternity, Mother specifically told Children and Youth that D.J. was the biological father of the child. *Id.* at 23.

From birth until placement, the child was hospitalized, and following discharge, was immediately placed in foster care. Children and Youth filed a petition to terminate the parental rights of Father on July 29, 2024. *Id.* at 11, 45. Ms. Stewart further testified that Father first contacted her on May 29, 2024, claiming to be A.M.L. 's natural father. When questioned regarding his absence for eighteen (18) months, Father explained that he was waiting for Mother to "get her life together" and intended for her to care for the child. He therefore believed he had no need to pursue contact with A.M.L. Father also claimed that he and Mother were living together at the time of the child's birth, that he purchased the pregnancy test confirming her pregnancy, and that he was in contact with her throughout her pregnancy. He further related to Ms. Stewart that two days prior to reaching out to Ms. Stewart, he had Mother evicted from his home. *Id.* at 12, 48–49.

Ms. Stewart emphasized that Mother had been involved with Children and Youth since 2022 and was fully aware of the child's placement in November of 2022. If Mother was residing with Father in November of 2022, Father made no effort to contact Children and Youth until May 29, 2024, eighteen (18) months subsequent to the placement of the child in foster care. *Id.* Ms. Stewart testified that had Father identified himself as the biological parent at the outset, Children and Youth would have made referrals for services for him, and he would have been served with a shelter care petition at the time of the child's removal from Mother's custody at the hospital. Instead, Father waited until May 2024 to come forward. *Id.* at 24–25.

Ms. Stewart testified that Father never visited the child. On September 12, 2024, after the petition to terminate his parental rights had been filed on July 29, 2024, Father

7

appeared at the agency and requested visits with the child. At that time, however, no visits had been ordered by the court, nor had Father's counsel filed a petition for visitation. *Id.* at 13. Ms. Stewart also testified that she was unable to complete an assessment of Father because he refused to participate in services. *Id.* at 14. Father was also court-ordered to submit to genetic testing to establish paternity; however, he refused to comply. Instead, he subsequently signed an Acknowledgment of Paternity. *Id.* at 46.

Between January 29, 2024, and July 29, 2024, six months immediately preceding the filing of the petition, Father failed to perform any parental duties. Specifically, Father did not:

1. Provide any financial support for A.M.L. through the Department of Domestic Relations;

2. Provide gifts in kind, such as food, clothing, or other necessities;

3. Communicate with A.M.L. in any form, including letters, phone calls, or cards;

4. Provide gifts for any occasion, including birthdays or holidays; or

5. Maintain consistent contact with the agency or foster home to inquire about the child's well-being. *Id.* at 13–14.

Ms. Stewart concluded that Father has not performed any significant parental duties for A.M.L. since the child's placement. Ms. Stewart further testified that Father has sixteen (16) children in total, and that his parental rights to two other children were terminated in December 2018 and December 2019. In those cases, the court had ordered Father to participate in parenting education, substance abuse evaluations, random toxicology screens, and to maintain stable housing. According to Ms. Stewart, Father failed to comply with those requirements. *Id.* at 15.

8

From her review of records, Ms. Stewart confirmed that Father's prior loss of parental rights regarding his other two (2) children resulted from his refusal to engage in required services. *Id.* at 29. Ms. Stewart again emphasized, under cross-examination, that Father had been directed to engage in services with respect to his other children and had refused to comply, and that he continued this pattern of refusal in the present case. *Id.* at 37.

Ms. Stewart denied Father's claim that he had contacted Children and Youth multiple times prior to May 2024. She stated that in her nearly two years as a caseworker on the case, the first time she heard from Father was in May 2024. *Id.* at 34. The court notes that even if Mother lied about the identity of A.M.L.'s father, Father admitted that he knew of A.M.L.'s birth and therefore had every opportunity to contact Children and Youth himself. He chose not to do so until May 2024, and even then, refused to participate in services. Although Father claimed that he attempted to contact Children and Youth prior to May 2024 in order to see the child, this Court does not find Father credible. According to Ms. Stewart, Father admitted that he did not intend on reaching out to Children and Youth since he was waiting for Mother to complete her services and regain custody of the child. Ms. Stewart also testified that Mother's last visit with A.M.L. was in March 2023, more than a year prior to the termination of her parental rights, which occurred on April 10, 2024. *Id.* at 45. The Court finds Father's testimony to be inconsistent, unreliable and not credible.

Based on her twenty-five (25) years of experience, Ms. Stewart testified that if an individual contacts the agency, the individual is promptly connected with a caseworker for assessment. In the event a caseworker is unavailable, a message is relayed, and the caseworker follows up. She stated she never received any communication in the form of

9

telephone calls, voicemails, texts, or otherwise from Father prior to May 29, 2024. *Id.* at 50–51. Ms. Stewart further added that when she had a meeting with the intake caseworker, there was no mention of Appellant Father. *Id.* at 51.

Ms. Stewart confirmed that Father formally identified himself to Children and Youth in May 2024 and appeared again on September 12, 2024, to request visits with the child. Between those dates, there had been at least one permanency review or status hearing, which Father and his counsel attended. *Id.* at 55–56. She reiterated that Father admitted he delayed involvement because he expected Mother to regain custody after completing her services. *Id.* at 60. She also confirmed that when she met with D.J., the putative father, in prison, D.J. never identified T.C. as the biological father, nor did Mother ever inform her that T.C. had been residing with her. *Id.* at 55, 62–63.

Father testified that he was hospitalized at the time of A.M.L.'s birth. Upon learning of her birth, he stated that he discharged himself from the hospital in order to be present. According to Father, he and Mother went together to sign documents necessary to issue the child's birth certificate. He further testified that the child was in the Neonatal Intensive Care Unit, but claimed that Children and Youth would not permit him to see her. Father related that when he was in the hospital's waiting room, a nurse approached him and informed him that security officers had been called because Children and Youth did not want him there. He claimed that security then removed him from the unit. *Id.* at 66–67. Father further testified that security told him he was barred from the hospital at the request of Children and Youth; however, he admitted that he did not actually see any Children and Youth caseworker present at the hospital. *Id.* at 84.

10

Ms. Stewart also testified that she reviewed Children and Youth's case notes regarding the child's birth and the agency's contact with Mother at the hospital. There was nothing in the file indicating that Father was present at the hospital when the child was born. N.T. 3/24/25 at 60.

Father stated that after being removed from the hospital, he remained in contact with Mother. He further claimed that when Mother participated in video visits with the child, he was present with her. N.T. 2/3/25 at 68. He also testified that he purchased items for the child, including a crib, bassinet, blankets, diapers, wipes, and a car seat, and that he kept screenshots of photographs Mother sent him of the child. *Id.* at 69.

Father testified that he attempted to contact Children and Youth concerning all of his children. He alleged that he telephoned Ms. Stewart, asked to speak with her supervisors employed by Children and Youth and also appeared in person at the agency's office, where Ms. Stewart allegedly told him he could not see his child. According to Father, his requests for visits were denied, and he was subsequently served with the petition to terminate his parental rights. *Id.* at 70–71, 75. Father further testified that he was not offered any referrals for services during the proceedings because his prior termination of parental rights with his two other children created "aggravating [sic] circumstances," thereby relieving Children and Youth of its obligation to provide services. He stated that without referrals, he was unable to access services in Luzerne County. *Id.* at 74–75.

The Court notes that there is a pending motion filed in October 2024 concerning whether aggravated circumstances apply in relation to the child, A.M.L. based upon the involuntary termination of Father's rights to two other children. As this Honorable Superior Court is aware, a finding of aggravated circumstances would obviate the

11

requirement that Children and Youth implement a family service plan and coordinate services for Father. This Court reasoned that ruling on such a motion after Children and Youth had already filed for termination of parental rights was not proper and determined that deferring a ruling was appropriate based upon the outcome of the termination of parental rights hearing. As this Court entered a decree terminating Father's parental rights on June 30, 2025, that petition was rendered moot. It is further noted that this Court terminated Father's parental rights based on 23 Pa.C.S.A. section 2511 (a)(1), due to Father's lack of contact with the child, and not Father's lack of engagement in services.

Father claimed that he independently obtained a mental health evaluation because Children and Youth did not provide him with a referral. *Id.* at 78. He also alleged that the agency knew he was residing with the natural mother. *Id.* at 76. Father testified that while incarcerated in or around 2018, he participated in parenting classes, a substance abuse evaluation, and a mental health evaluation. He further stated that while incarcerated on December 18, 2019, during the time of his prior termination proceedings, he attended a program called "Inside Out Dads". *Id.* 76, 80. The court notes that A.M.L. was not alive during that time. Her date of birth is October    2022. Father's participation in services in 2018 and 2019 are unrelated and irrelevant to the present case.

Father also alleged that he contacted Children and Youth repeatedly over the past seven (7) years, claiming that on one occasion the agency "called security on him." *Id.* at 81–82. He testified that he believed he was being punished because of Mother's substance abuse issues. *Id.* at 82. Father introduced receipts of support payments made through the Domestic Relations Office to benefit the child in October of 2024,

12

though he acknowledged these payments were all made subsequent to the filing of the petition to terminate his parental rights. *Id.* at 97.

Father further testified that when he was served with the petition to terminate his parental rights, he did not seek visits with the child, explaining that Ms. Stewart told him he was not permitted visitation because of the pending petition. *Id.* at 107. Ms. Stewart explained that there was not a court order granting father visits with the child as his paternity was questioned. *Id.* at 13. Furthermore, Ms. Stewart testified that Father was court ordered to submit to a DNA test; however, he refused to submit to the test to confirm his paternity. Mother also represented that D.J. was the biological father and not T.C., the appellant. Father, T.C., claimed that he was at the hospital with Mother to sign the Acknowledgment of Paternity on the day of A.M.L.'S birth, however the facts of the case indicate that he was able to sign an Acknowledgement of Paternity in the Fall of 2024 as one had never been signed.

There are many questions that need answers in this case, such as: If Mother was with Father (T.C.) at the hospital, why would Mother identify D.J. as the father of her child and not T.C.? Why did Father refuse to submit to a DNA test if he believed he was the father? Wouldn't a DNA test refute Mother's contention that D.J. was the father? Father refused to submit to a paternity test, refused to participate in any services, and simultaneously expected Children and Youth to grant him visits with the child. On cross-examination, Father clarified that he did not sign the documents necessary to issue the child's birth certificate at the hospital, though he claimed that he attempted to do so. *Id.* at 28. He testified that, after signing an Acknowledgment of Paternity, his name was added to the child's birth certificate. *Id.* at 29. When asked whether Mother ever acknowledged him as the father, Father refused to give a direct answer and

13

responded evasively. *Id.* at 29. It was established through cross-examination that Father signed the Acknowledgment of Paternity in September 2024 subsequent to Mother's parental rights been terminated in April 2024. *Id.* at 30. Father was presented with a copy of the child's birth certificate issued in 2023 that did not list him as the father. *Id.* at 38. Father then admitted that his name was not added to the child's birth certificate until October 2024. *Id.* at 36.

Father denied that his first contact with Ms. Stewart occurred in May 2024. Instead, he claimed that he contacted Children and Youth in October 2022 after being denied access to his daughter at the hospital following her birth. *Id.* at 12–13. However, Father acknowledged that he did later reach out to Ms. Stewart in May 2024. *Id.* at 14. Father explained that he did not want his personal issues to become entangled with Mother's. Accordingly, when he learned that Mother's parental rights had been terminated, he decided to step forward and attempt to pursue contact with his child. *Id.* at 15. On cross-examination, Father reiterated that he was aware of Mother giving birth on the very day A.M.L. was born. *Id.* at 20–21. Throughout the hearing, Appellee Children and Youth's counsel attempted to question Father regarding his contact with the child; however, Father repeatedly gave unresponsive answers and digressed into unrelated matters. *Id.* at 22–24.

The Court, therefore, finds that based upon the testimony of Ms. Stewart and the evidence presented before the Court, Father has refused or failed to perform his parental duties at least six (6) months prior to the filing of the petition to terminate his parental rights.

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry:

14

(1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Title 23 Pa.C.S.A § 2511 (b). *In re: C.E.D.H.*, 2025 Pa. Super. 107, 338 A.3d 1010, 1021 (2025); *In re: Z.S.W.*, 946 A.2d 726, 730 (Pa. Super. 2008).

With grounds for termination under Title 23 Section 2511 (a)(1), **the first line of inquiry** as aforementioned, is the parent's explanation for his conduct.

During cross-examination, Father was questioned as to why he had not asserted his parental rights prior to May 2024. Father responded that he did not want his rights to be intertwined with Mother's rights because of his prior negative experiences with Children and Youth. He testified that he preferred to exercise his rights independently so as not to be penalized for Mother's lack of compliance. N.T. 3/24/25 at 72. Father also stated that he did not wish to contact the agency until Mother's parental rights were terminated. N.T. 2/3/25, at 103.

Father was further asked whether it was in the child's best interest to wait such a lengthy period of time before he asserted his rights. Father responded, "so the fight with the system, as long as it took, it — it has nothing to do with me." N.T. 3/24/25 at 73. Father was also asked whether he acknowledged that, during the period he delayed coming forward, the foster parents were the ones providing care for the child. He explained that he had been facing criminal charges that he needed to defend against, as well as undergoing surgery to treat his cancer, which lasted approximately two (2) years. *Id.* at 73–74. N.T. 2/3/25, at 104. He stated that he needed to resolve those matters before he was in a position to request visitation with his child. N.T. 3/24/25 at 73–74.

15

Father recalled that he was incarcerated for approximately four months and released in January 2024. *Id.* at 8. Father acknowledged that he did not contact Children and Youth from jail, stating that telephone calls were not permitted. When questioned as to whether he attempted to arrange a call through a counselor in jail, Father was unresponsive. N.T. 2/3/25 at 105–106.

This court notes that Father was not incarcerated between January of 2024 and July 29, 2024, six (6) months prior to the filing of the petition to terminate Father's parental rights. During that period of time, when he was no longer incarcerated, Father did not contact Children and Youth in order to see the child. Father waited until September of 2024, two months after the petition to terminate his parental rights was filed, before he requested visits with the child. Title 23 Pa. C.S. 2511(b) "Other Considerations" states that when a petition is filed pursuant to subsection (a)(1), the court shall not consider any effort by the parent to remedy the conditions described within the petition to terminate parental rights which are first initiated subsequent to the filing of the petition to terminate the parent's parental rights. As stated above, the petition to terminate Father's parental rights was filed on July 29, 2024 and Father did not request visits to have contact with the child until September of 2024.

Father further testified that Mother misled him into believing that she was complying with her services in order to reunify with the child. According to Father, he discovered in March 2024 that Mother had not been truthful. *Id.* at 9. Father stated that when Mother moved in with him in March 2024, they resumed their relationship as a couple. He testified that he became aware that Mother's parental rights had been terminated when she stopped visiting the child. *Id.* at 11. Father stated that Mother later admitted to him that her parental rights had, in fact, been terminated. *Id.* The court

16

finds that Father's explanation regarding Mother's failure to comply with services is entirely irrelevant to his own lack of contact with the child. Father appears to believe that as long as Mother was pursuing efforts to regain custody of the child, he was relieved of his own responsibility to work toward reunifying with the child.

Thus, in the case at bar, the Court finds that Father did not act affirmatively and with good faith interest and effort in contacting A.M.L. The Court finds that Father, in the instant case, did not exert himself to maintain a place of importance in his child's life. Thus, the Court finds that at least six (6) months prior to the filing of the termination of Father's parental rights, Father refused or failed to perform any parental duties and his explanation for not performing his parental duties lacks any merit.

As the Superior Court provided in *In Re: I.J.* 972 A.2d 5, 11-12 (Pa. Super. 2009), "a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. The Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claim of progress and hope for the future."

In *In re Z.P.*, 994 A.2d 1108, 1119 (Pa. Super. 2010), the Superior Court in *citing In re B.N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, 582, Pa. 718, 872 A.2d 1200 (2005) stated the following:

> Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his ... ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. **Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.**

17

The **second line of inquiry** is the post-abandonment contact between parent and child. It was established on the record by Ms. Stewart's testimony that Father has not had any contact with the child since the child's placement on November 1, 2022. Thus, there was a gross excess of six months post last contact between Father and the minor child. The credible testimony given by Ms. Stewart confirms that there has not been any post-abandonment contact between Father and the minor child.

The **third line of inquiry**, as stated in *In re: Z.S.W.* 946 A.2d 726 (Pa. Super. 2008) requires the Court to review the evidence in support of termination under Title 23 Pa.C.S.A. Section 2511 (b). The Court must determine whether the termination of parental rights would best serve the developmental, physical and emotional needs and welfare of the child. *In re C.M.S.*, 884 A.2d 1284, 1286-87 (Pa. Super. 2005). "Intangibles such as love, comfort, security and stability are involved in the inquiry into the needs and welfare of the child." *Id.* at 1287. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect of permanently severing that bond on the child. *Id.*

Ms. Jamie Stewart testified that the minor child has remained in the same foster home with the same foster parents since being discharged from the hospital on November 1, 2022. Ms. Stewart explained that, as part of her duties, she visits the foster family's residence every thirty (30) days. Each visit lasts between forty-five (45) minutes to one (1) hour, during which she meets with the foster parents and engages in discussions regarding the child's well-being. N.T. 3/24/25 at 55, 61. According to Ms. Stewart, the child has fully assimilated into the foster family. Photographs of the child

18

are displayed throughout the home, and the child participates in family events and vacations. *Id.*

Ms. Stewart testified that the foster family consistently meets the child's physical needs by providing food, clothing, and shelter. *Id.* at 55. She noted that the child has her own bedroom in the foster home. *Id.* at 56. The foster parents also ensure that the child attends all necessary medical appointments. *Id.* at 56.

In addition, Ms. Stewart stated that the foster parents also meet the child's developmental needs. The child is enrolled in age-appropriate activities, including swimming classes. The foster parents engage her in learning numbers, letters, and colors, and provide developmentally appropriate toys. They also read books with her. *Id.* The child has been referred for an early intervention evaluation to address potential speech delays. *Id.* at 68.

Ms. Stewart testified that the foster parents also meet the child's emotional needs. They provide comfort and praise, appropriately respond when she is upset, and the child seeks them out for reassurance. *Id.* at 56.

According to Ms. Stewart, the foster family has expressed a desire to adopt the child. They understand that if adoption is granted, the child would have the same rights as a biological child, including inheritance rights. The foster parents expressed no concerns or reservations about adoption, and Ms. Stewart testified that she herself had no concerns whatsoever regarding the foster family's ability to adopt the child. *Id.* at 57.

Ms. Stewart further testified that the foster parents and the child share a close, parent-child type of bond. The foster parents love the child, and that love is reciprocated by her. *Id.* In contrast, Ms. Stewart stated that she is not aware of any bond between Father and the child. Father has never had any in-person visits or video visits with the

child. *Id.* at 57–58. In fact, the child has had no contact with Father since birth. *Id.* at 58. She noted that Mother had supervised visits with the child through a provider known as Vision Quest, but those visits ended in March 2023. *Id.* at 58.

According to Ms. Stewart, Father did not step into the case until May 2024. She confirmed that she had no personal contact with Father prior to that time. *Id.* at 58. After reviewing the case file in January 2023, including the notes of a prior caseworker, Ms. Stewart found no reference to any contact between Father and the child. *Id.* at 58–59.

Ms. Stewart expressed that in the event the court was to terminate Father's parental rights, the child would be positively impacted. She explained that the child has lived with the foster parents for more than two years and would thereby gain permanency within their home. She further opined that termination of parental rights would not cause the child any negative or detrimental effects and that adoption by the foster parents would serve the child's best interests. *Id.* at 60.

Accordingly, the court finds that the termination of Father's parental rights would best serve the needs and welfare of the child.

## V. ADDITIONAL CONSIDERATIONS UNDER 23 P.A.C.S.A. SECTION 2511(b)

### A. ENVIRONMENTAL FACTORS

Title 23 Pa. C.S.A. Section 2511(b) specifies that a court may not terminate the parental rights "solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of the parent."

20

As "environmental factors beyond the control of Father" was not the linchpin in the placement of the minor child and because of the presence of other, independent factors utilized in the placement of A.M.L., this consideration does not apply and will not be addressed.

## B.      NEEDS AND WELFARE OF THE CHILD

Once the Court has found that involuntary termination of parental rights is warranted under the Act, the court must then "give primary consideration to the developmental, physical and emotional needs and welfare of the child." This is to be a separate inquiry and even where the court has already considered the needs and the welfare of the child under one of the grounds of termination, the court must do so again. *In re Matsock*, 611 A.2d 738 (1992).

The Court has done this and finds the same considerations apply that have already been discussed extensively in this opinion. Furthermore, the Court applies the same reasoning for concluding that these needs will be served by the termination of Father's parental rights.

## VI.     ADOPTION AND SAFE FAMILIES ACT (ASFA) CONSIDERATIONS

The Pennsylvania Superior Court relied upon the Adoption and Safe Families Act (ASFA) in *In re Z.P.*, 994 A.2d 1108 (Pa. Super. 2010). The goal of ASFA was described as follows:

> Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

*Id.* at 1119-1120 citing *In re G.P.*, 851 A.2d 967, 975-976 (Pa. Super.

21

2004)

The Court also provided that "above all else . . . adequate consideration must be given to the needs and welfare of the child . . . A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *Id.* at 1121 (internal citations omitted).

In reversing the trial court and terminating the natural parent's parental rights, the Superior Court held:

> "ASFA-related policies now demand reasonable efforts within a reasonable time to remedy parental incapacity. Z.P. has already been in foster care for the first two years of his life, and his need for permanency should not be suspended, where there is little rational prospect of timely reunification."

*Id.* at 1125-26.

These ASFA-related policies are applicable in the present case. The child has been in placement since November 1, 2022, and the petition to terminate Father's parental rights was filed on July 29, 2024. The first day of hearing pertaining to the termination of Father's parental rights occurred on February 3, 2025. Accordingly, a reasonable time of eighteen (18) months has expired and there is little rational prospect of the timely reunification of A.M.L. to her father.

## VII.   CONCLUSION

Finally, the Court notes that the Guardian *Ad Litem* for the child expressed in her written recommendation filed on June 20, 2025 that it is in the child's best interest to terminate the parental rights of Father to the minor child.

The Guardian *ad litem* in her recommendation provides a thorough synopsis of the case in support of having Father's rights to be terminated in stating the following:

> With respect to Father, although, by his own testimony, he was aware from the inception of the case that the Minor Child was in the

22

care and custody of the Agency, he failed to establish any contact with the Agency throughout the course of the case, until after Mother's parental rights had already been terminated, and after the Minor Child had already been in placement with the kinship resource family for approximately nineteen (19) months. In addition, despite being court-ordered to do so, Father never submitted for the required assessment for services that he was supposed to, nor the DNA test. Furthermore, . . . , Father failed to request or engage in any kind of formal and sanctioned visits with the Minor Child. Thus, Father did not establish his ability or even his desire, to be a permanent resource for the Minor Child.

The minor child has been in foster care with her proposed adoptive parents since November 1, 2022. The Court finds that Father is not able to serve his child's best interests or needs. In stark contrast, the foster parents of the child have amply demonstrated that they continue to meet the child's physical, developmental and emotional needs and that the minor child has thrived under their care. The minor child needs and deserves a permanent home with loving capable parents. The only way to provide this to the minor child is to terminate the rights of the Father. Clearly, it is in the minor child's best interest to do so.

Respectfully submitted,

BY THE COURT,

JENNIFER L. ROGERS                    J.

DATE: 9/9/25

23

Copies to:

Paul Ware, Esquire
Counsel for Father
700 Vine Street
Scranton, PA 18510

Nicholas Seaman, Esquire
Luzerne County Children, Youth & Families
111 North Pennsylvania Blvd
Wilkes-Barre, PA 18701

Maria Turetsky, Esquire
Guardian *Ad Litem*
105 Winchester Way
Scranton, PA 18504